UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILBERT ANDREWS and STEVEN KHAN, individually and on behalf of all others similarly situated,

        Plaintiffs,

-against-

SAZERAC COMPANY, INC.,

        Defendant.

23-cv-1060 (AS)

AMENDED OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

  Wilbert Andrews and Steven Khan bring this putative class action against Sazerac Company, Inc., the company behind Southern Comfort whiskey. Plaintiffs say that Sazerac deceived consumers by selling a malt beverage that looks like Southern Comfort whiskey but in fact contains only "whiskey flavor." Plaintiffs move to certify a class of "[a]ll persons who purchased the Southern Comfort Malt Products in the State of New York at any time during the period February 8, 2020, to the date of judgment." Dkt. 68 at 8. For the following reasons, the motion is GRANTED IN PART. The Court certifies the class, but only Khan may proceed as its named representative.

## BACKGROUND

  Sazerac "manufactures, packages, labels, markets, and sells fruit and spice flavored liqueur under the Southern Comfort brand." Dkt. 64 ¶ 1. In the last few years, Sazerac has begun selling a Southern-Comfort branded "malt beverage" in gas stations, drug stores, and grocery stores, where liquor laws prevent it from selling whiskey. Dkt. 68 at 1.

  The malt beverage comes in three sizes: 50ml, 100ml, and 355ml. Dkt. 75-6 ¶ 5. The 50ml bottle is cylindrical, while the two larger sizes are relatively flat. *Id.* ¶¶ 5–6. But each one shares what plaintiffs say are "deceptive elements." Dkt. 84 at 2. The "colors, themes, fonts, symbols[,] and spacing" on the malt-beverage bottles are identical to Southern Comfort whiskey bottles. Dkt. 64 ¶ 15. In plaintiffs' view, the similarities between the two products "create[] an overall misleading impression" that the malt beverage contains distilled spirits. *Id.* ¶ 24. Further, each malt-beverage bottle has a statement of composition, which until April 2023 described the drink as a "malt beverage with natural whiskey flavors, caramel color and oak extract." *Id.* ¶ 16 (capitalization omitted); *see also* Dkt. 78 at 3. Plaintiffs say that the inclusion of the "whiskey flavors" and "oak extract" language contributed to this misleading impression. Dkt. 64 ¶¶ 22–23.

  In February 2023, Christina Del Rosario sued Sazerac on behalf of a putative class of malt-beverage purchasers. Dkt. 1. Sazerac moved to dismiss Del Rosario's claims to the extent that they

were based on the "whiskey flavors" and "oak extract" phrases, arguing that federal regulations required their use. Dkt. 39-1 at 1. The Court denied the motion to dismiss after holding that Sazerac had not met its "heavy" burden of showing that Del Rosario's claims were preempted by federal law. *See Del Rosario v. Sazerac Co.*, 2023 WL 6318083, at *2–3 (S.D.N.Y. Sept. 28, 2023).

In February 2024, the Court granted leave to amend the complaint to replace Del Rosario as plaintiff. Dkt. 63. In the second amended complaint, Andrews and Khan sue Sazerac under sections 349 and 350 of the New York General Business Law ("GBL"), which prohibit consumer deception and false advertising. *See* Dkt. 64 ¶¶ 62–83. Now, after the close of discovery, plaintiffs move for class certification under Federal Rule of Civil Procedure 23.[1] Dkt. 71.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 23 governs class actions. "To maintain a class action, plaintiffs must demonstrate that '(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.'" *Elisa W. v. City of New York*, 82 F.4th 115, 122 (2d Cir. 2023) (quoting Fed. R. Civ. P. 23(a)). "These requirements are known as numerosity, commonality, typicality, and adequate representation." *Id.*

"In addition to satisfying these requirements, plaintiffs must . . . show that one of the three conditions of Rule 23(b) is met." *Id.* Here, plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members" and a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The plaintiff bears the burden of proving these requirements, which are known as "predominance" and "superiority," by a preponderance of the evidence. *See In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017).

## DISCUSSION

### I. Standing

As a threshold issue, Sazerac argues that Andrews lacks standing because he never bought the malt beverage. Dkt. 78 at 8–9. Sazerac points to Andrews's deposition testimony, in which he testified that he bought "spirit whiskey," not the malt beverage. Dkt. 75-13 at 8–9. Further, Andrews repeatedly testified that he bought a product called "Sazerac smooth beverage" with a dark red label, but the malt beverage's labels are "mostly white." Dkt. 78 at 9; *see also* Dkt. 75-13 at 4. Andrews responds by pointing to a different portion of his deposition testimony, in which

---

[1] On Sazerac's motion to dismiss, the parties focused on the misleading nature of the "whiskey flavor" and "oak extract" statements made on the bottles' labeling. But plaintiffs' proposed class definition includes people who purchased the malt beverage after the label was changed around April 2023 to omit these phrases, *see* Dkt. 78 at 3, and plaintiffs' class certification argument is based primarily on other similarities between the malt and whiskey bottles. Neither side mentions this change in plaintiffs' theory of the case, so the Court doesn't factor it into its class certification analysis.

Andrews's counsel put the malt bottle in front of him and asked him whether it was the product he bought, and Andrews said yes. *See* Dkt. 84-2 at 9–10. He also points out that he testified that he bought the "Sazerac smooth beverage" at a convenience store, where whiskey products aren't sold. *See* Dkt. 84 at 1; Dkt. 84-2 at 8.

After reviewing the deposition excerpts, the Court finds it unclear whether Andrews did in fact purchase the malt beverage. But the Court need not resolve this issue to get to the merits. "To establish Article III standing in a class action, . . . there must be at least one named plaintiff who can assert a claim directly against th[e] defendant, and at that point standing is satisfied and . . . the inquiry shift[s] to a class action analysis." *Central States S.E. & S.W. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) (quoting 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 2:6 n.3 (4th ed. 2002)); *see also Amador v. Andrews*, 655 F.3d 89, 99 (2d Cir. 2011) ("[A] class action cannot be sustained without a named plaintiff who has standing."). So "only one of the named [p]laintiffs is required to establish standing in order to seek relief on behalf of the entire class." *Central States*, 504 F.3d at 241. Sazerac hasn't challenged Khan's standing, so the Court proceeds to the Rule 23 analysis.

## II. Numerosity

The parties do not dispute that plaintiffs have satisfied Rule 23(a)'s numerosity requirement. "[N]umerosity is presumed at a level of 40 members," *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995), but evidence of "exact class size or identity of class members" is not required, *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Sales data obtained in discovery shows that Sazerac sold tens of thousands of units of malt beverage in New York during the relevant period, Dkt. 68 at 10, which suggests that many more than forty people would be part of the class.

## III. Commonality

"To satisfy commonality, plaintiffs must affirmatively demonstrate by a preponderance of the evidence that there are questions of law or fact common to the class." *Elisa W.*, 82 F.4th at 122–23. "[C]ommonality turns on the ability of the action to 'generate common *answers* apt to drive the resolution of the litigation.'" *Id.* at 123 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "Thus, commonality exists if there is a question such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350). However, "claims for relief need not be identical for them to be common; rather, Rule 23(a)(2) simply requires that there be issues whose resolution will affect all or a significant number of the putative class members." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

"Commonality often depends on a plaintiff's theory of liability." *Sharpe v. A&W Concentrate Co.*, 2021 WL 3721392, at *3 (E.D.N.Y. July 23, 2021). Plaintiffs' theory of liability against Sazerac is premised on sections 349 and 350 of New York's General Business Law. *See* Dkt. 64 ¶¶ 62–83. "To successfully assert a claim under either section, 'a plaintiff must allege that a

3

defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012)). Andrews and Khan say that their theory of liability raises two questions common to the class: whether Sazerac's conduct was "consumer-oriented" and whether it was "materially misleading." Dkt. 68 at 11–12.

Sazerac doesn't dispute that whether its conduct was "consumer-oriented" is a question common to the class. *See Sharpe*, 2021 WL 3721392, at *6 (concluding that "*all* elements of liability [under the GBL]—the consumer-oriented conduct, the materially misleading statement, and the resulting injury—will depend on classwide proof"). And this admission alone is sufficient to satisfy Rule 23(a)'s commonality requirement. *See Wal-Mart*, 564 U.S. at 359 ("For purposes of Rule 23(a)(2) even a single common question will do." (cleaned up) (citation omitted)).

But Andrews and Khan are also right that the "materially misleading" prong does the trick. In interpreting sections 349 and 350 of the GBL, "[t]he New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Orlander*, 802 F.3d at 300 (alteration in original) (quoting *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007)). When an issue is "objective," it "can be proved through evidence common to the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013). So "where the consumer protection statute at issue supplies an objective test, such claims are considered 'ideal for class certification' because they allow the court to adopt classwide presumptions of reliance and do not require an investigation into 'class members' individual interaction with the product.'" *Ackerman v. Coca-Cola Co.*, 2013 WL 7044866, at *10 (E.D.N.Y. July 18, 2013) (citation omitted).

Sazerac objects that plaintiffs don't have classwide proof that the bottles' labeling was materially misleading. The company says that a survey conducted by Dr. Andrea Matthews, which found that 62.9% of consumers believed that the malt-beverage mini bottles contained whiskey, doesn't "support[] the notion that the [malt] packaging was deceptive" because the survey was fatally flawed. Dkt. 78 at 10; *see* Dkt. 71-35 ¶ 32. And in any event, Sazerac says that the survey shows only that the packaging of the 50ml bottles is materially misleading because Matthews showed these small bottles, but not the 100ml and 355ml bottles, to survey respondents. Dkt. 78 at 10–11. Sazerac says that the 100ml and 355ml bottles differ from the 50ml bottles in material ways: the 50ml bottle is cylindrical, while the larger bottles have "relatively flat front[s]," and the statement of composition, which says that the drink contains "malt beverage," appears in larger font on the bigger bottles. Dkt. 75-6 ¶¶ 5–6; *see also* Dkt. 78 at 10–11. Sazerac argues that these differences "require an independent assessment of whether each bottle type would mislead a reasonable consumer." Dkt. 78 at 11.

To be sure, in the fraud context, class certification is "improper" when "there are material variations in the nature of the misrepresentations made to each member of the proposed class." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002). Assuming this principle applies with equal force in the deceptive-advertising context, *see Passman v. Peloton Interactive, Inc.*, 671

4

F. Supp. 3d 417, 439 (S.D.N.Y. 2023) ("At most, th[is] case[] support[s] the proposition that when there are different allegedly false statements, there can be no single 'reasonable consumer' for materiality purposes across all different statements."), Sazerac doesn't explain why the two variations it points to are material. That the larger bottles are flat, instead of round, might be material if their shape would tend to indicate to reasonable consumers that the bottles contain malt beverage, not whiskey. But Sazerac doesn't say that its whiskey is only sold in round bottles, so it's not clear why the bottle shape makes a difference here. Sazerac's observation that the statement of composition appears in larger font on the larger bottles seems similarly irrelevant. On the one hand, "malt beverage" is in larger font. But so too were the allegedly misleading "whiskey flavor" and "oak extract" phrases, at least until April 2023. Regardless, the Court sees no reason why the impression created by a specific combination of elements on a small bottle would vary "significantly" from the impression created by those same elements on a larger bottle. *See Singleton v. Fifth Generation, Inc.*, 2017 WL 5001444, at 17 n.17 (N.D.N.Y. Sept. 17, 2017) (holding that claims based on misrepresentations that "appear to have varied significantly" were "not suitable for class treatment").

Further, whether plaintiffs can succeed on their claim that the product's packaging is materially misleading goes to the merits, not to class certification. *See Allegra v. Luxxotica Retail N. Am.*, 341 F.R.D. 373, 439 (E.D.N.Y. 2022) (rejecting argument that plaintiffs "lack[ed] classwide evidence that the reasonable consumer would interpret, and therefore be deceived by, the Alleged Misrepresentations" as an attempt to "have the Court prematurely and improperly resolve merits questions at the class certification stage"); *see also Passman*, 671 F. Supp. 3d at 452 ("Named Plaintiffs are not required to proffer at this stage the evidence that they will offer at trial to show that the Challenged Statement would be material to a reasonable consumer."). For now, "[i]t is sufficient that the answer to the question of whether the [packaging] was material with respect to one member of the class will be identical with respect to every member of the class." *Passman*, 671 F. Supp. 3d at 452; *see also id.* ("If the evidence offered by [plaintiffs] fails to persuade the factfinder that the [packaging] would be material to a reasonable consumer, that conclusion will be binding on all putative class members.").

The two cases that Sazerac relies on to support its position to the contrary are easily distinguished. In *McKinnon v. Dollar Thrifty Automotive Group, Inc.*, 2015 WL 4537957 (N.D. Cal. July 27, 2015), the court held that there was no commonality in a suit against a rental car company under California's Unfair Competition Law (UCL) and Consumer Legal Remedies Act (CLRA), based on the company's sale of liability coverage. *Id.* at *1, *9. There, plaintiffs' proposed class definition included individuals "who were not injured because they were not deceived or because they benefited from the additional [liability] coverage," so determining whether a class member was harmed by Dollar's practices would have required individualized inquiries into each member's interactions with the company. *Id.* at *9. And the court characterized the plaintiffs' claims as turning on "what particular agents said to particular customers," such that the alleged facts "apply only to some customers, at some locations, some of the time." *Id.* That's not this case, which isn't based on one-to-one customer interactions, but rather common allegedly

5

deceptive features on Sazerac's malt-beverage bottles. And to the extent that the *McKinnon* court's holding was based on confounding reliance issues, "sections 349 and 350 of the GBL do not contain a viewing requirement or a reliance requirement, nor do they require individual determination of how a particular advertisement affected each putative class member." *See Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 274 (E.D.N.Y. 2019). In other words, there's no need to determine whether individual consumers were actually deceived; that's the whole point of the objective "reasonable consumer" test, which doesn't ask whether each consumer *in fact* found the product misleading.

*Rivera v. Harvest Bakery Inc.*, 312 F.R.D. 254 (E.D.N.Y. 2016), is even farther afield. There, the court declined to certify a class of "all persons who work or have worked" for Harvest Bakery because the class claims were based on allegations that the bakery didn't pay hourly workers their overtime wages. *Id.* at 268. But the class definition would bring in non-hourly employees who were exempt from overtime, so the court amended the class definition to "all current and former non-exempt hourly employees who worked for the [bakery]." *Id.* Here, the class definition isn't overbroad because it includes only purchasers of the allegedly deceptive product. Again, whether plaintiffs can actually prove that the product's packaging is misleading is a separate question.

## IV.    Typicality and Adequacy

"Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Elisa W.*, 82 F.4th at 128 (citation omitted). Sazerac says that Andrews's claim isn't "typical" because he is subject to the unique defense that he lacks standing. Dkt. 78 at 12. As to Khan, Sazerac says that his claim isn't "typical" because he didn't purchase a 50ml bottle. *Id.* at 12–13. In Sazerac's view, these "unique defenses" also make Andrews and Khan inadequate class representatives. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ("Regardless of whether the issue is framed in terms of the typicality of the representative's claims . . . or the adequacy of its representation, . . . there is a danger that absent class members will suffer if their representation is preoccupied with defenses unique to it."), *abrogated by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017).

The Court disagrees that Khan isn't a typical or adequate representative. The typicality requirement, which is "not demanding," *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 311 F.R.D. 373, 379 (S.D.N.Y. 2015) (citation omitted), is usually met "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, . . . irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936–37. For this reason, "[d]ifferences in amounts or characteristics of the class representatives' purchases do not defeat typicality." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 114 (S.D.N.Y. 2015). Khan's "unique defense," i.e., purchasing one of the larger bottles, is simply a purchasing variation and so doesn't defeat typicality or adequacy. *See In re Sumitomi*

*Copper Litig.*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998) (collecting cases where class was certified despite "variation in fact among class members").

The Court agrees, however, that Andrews isn't an adequate class representative, given his confusing and contradictory deposition testimony. When considering a class representative's adequacy, "courts may consider the honesty and trustworthiness of the named plaintiff." *Savino v. Comput. Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998). Courts have denied class certification "where the putative class representatives display 'an alarming unfamiliarity with the suit' . . . or are so lacking in credibility that they are likely to harm their case." *In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 47 (E.D.N.Y. 1997) (citations omitted).

That's the case here. In his deposition, Andrews appeared not to know the basic premise of the case:

> Q: [W]hen I asked you earlier, you were unaware of the fact that there were two versions of Southern Comfort, . . . one a spirit whiskey and one a malt beverage, right?
>
> A: Right.
>
> Q: This was news to you today, correct?
>
> A: Yes.

Dkt. 84-2 at 10–11. He also testified several times that he purchased the whiskey version of Southern Comfort, not the malt beverage:

> Q: You told me earlier that the version that said "spirit whiskey" is what you purchased and then you affirmed it. That's what you purchased, right?
>
> A: Yes.

*Id.* at 11. Finally, in response to questioning, Andrews admitted that he lied in his interrogatory answers and signed what his lawyers put in front of him without reading it:

> Q: [T]he answer to interrogatory number 1, subpart E, says that you paid a dollar fifty for each of the bottles that you purchased; that's not a true statement, is it?
>
> A: No.
>
> Q: Well, if that wasn't a true statement, why did you sign this document under penalty of perjury?
>
> A: When I had got this document, they asked me to sign it.
>
> Q: But you read it before you signed it, didn't you?
>
> A: I read some of it.
>
> Q: Well, if you're swearing that something is true under penalty of perjury . . . you would want to make sure before you signed it that it was true, right?
>
> A: Yes.
>
> Q: So what did you do if . . . you just signed it even though you knew it was not true?

7

A: The, umm—the email said that it was the document that I had had to sign, so I had—I had signed it right—right away.

Q: Without looking at it?

A: Yes. I only looked at the, umm, e-mail . . . that I had.

Dkt. 75-13 at 5–6.

Andrews can't adequately represent a class when he doesn't know the basic premise of the suit, can't give straightforward testimony about whether he bought the product at issue, and admitted to lying in his interrogatory answers. *See Panzirer v. Wolf*, 663 F.2d 365, 368 (2d Cir. 1981) (affirming inadequacy of named representative where plaintiff "gave no less than four versions of her conversation with her broker" so her "lack of credibility [was] abundantly clear in the record"), *vacated as moot sub nom. Price Waterhouse v. Panzirer*, 459 U.S. 1027 (1982). So only Khan can proceed as class representative.

## V. Predominance

The predominance requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013)).

### A. Materially Misleading

Sazerac first says the common issues here don't predominate because whether the larger bottle sizes misled consumers will "need to be resolved by individual inquiries." Dkt. 78 at 14. Again, Sazerac misunderstands the "materially misleading" inquiry under sections 349 and 350 of the GBL. There is one product at issue in this case, which comes in three different bottle sizes. The primary difference between the 50ml bottles and the bigger bottles is that the bigger bottles are flat. In addition, the "statement of composition," which describes the drink as a "malt beverage," appears in larger font on the larger bottles. But each bottle "has the same [allegedly] deceptive elements." Dkt. 84 at 2. Specifically, all three sizes use branding elements identical to Southern Comfort whiskey, including colors, font, iconography, and taglines, and they all contain the same statement of composition. *See Taylor v. Am. Bankers Ins. Grp., Inc.*, 700 N.Y.S.2d 458, 459 (1st Dep't 1999) (upholding class certification under the GBL where plaintiffs challenged a "general practice" of offering insurance coverage while "relegating to small, inconspicuous print the precise terms of the coverage being extended," despite the "variety of forms and promotions" used by defendants). If a jury finds that the combination of these elements would mislead a reasonable consumer to think that they were buying Southern Comfort whiskey, instead of its malt beverage, then the issue is resolved for the entire class. There's no "individual inquiry" necessary.

Sazerac urges this Court to reach a different conclusion based on *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374 (S.D.N.Y. 2016). There, the court considered

8

whether a suit based on the misleading nature of Aveeno's "Active Naturals" line was amenable to class treatment. The court certified the class but created "subclasses based on the Aveeno Active Naturals product at issue." *Id.* at 403. "By grouping the determination by product," the court explained, "there are less issues implicating individual class member's particular situations":

> Assuming the product and its labeling and packaging remains constant and is uniform between consumers, then the only question is how such packaging would have influenced a consumer under the objective test. . . . But, if it is not demonstrated that "all members of the class saw the same advertisements" or if the content of the "advertising varied widely and not all the advertisements contained the alleged misrepresentations," then "questions of individual members' exposure to the allegedly deceptive advertising [would] predominate" on those claims.

*Id.* at 389 (alteration in original) (quoting *Solomon v. Bell Atl. Corp.*, 777 N.Y.S.2d 50, 53 (1st Dep't 2004)).

As courts in this circuit have recognized, however, the *Goldemberg* court relied on a New York appellate case to reach this conclusion that improperly "read an individualized reliance" inquiry into the GBL. *See Hasemann*, 331 F.R.D. at 266 ("*Goldemberg* is unpersuasive due to its reliance on a case that Defendant also relies upon, *Solomon*, which read an individualized reliance and causation inquiry into sections 349 and 350 of the GBL."). Even though New York courts have occasionally and incorrectly imposed such a reliance requirement, the New York Court of Appeals has stated unequivocally that "reliance is not an element of a section 349 claim." *See Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 & n.1 (N.Y. 2000). So *Goldemberg*'s reasoning does not hold.

### B. Causation, Injury, and Damages

Even if the misleading nature of the packaging can be determined in one fell swoop, Sazerac says that the predominance requirement still isn't satisfied due to individual inquiries required to determine causation, injury, and damages for each class member. Dkt. 78 at 15. Plaintiffs respond with a proposed damages model that they say would negate the need for any individualized inquiry.

To succeed on a GBL claim, a plaintiff must show that they "suffered injury as a result of the allegedly deceptive act or practice." *Orlander*, 802 F.3d at 300 (quoting *Koch*, 967 N.E.2d at 675). "This prong may be satisfied through an allegation that a plaintiff overpaid for the product, or, stated differently, 'by a claim that a plaintiff paid a premium for a product based on [the] defendants' inaccurate representations.'" *Hasemann*, 331 F.R.D. at 258 (alteration in original) (quoting *Ackerman v. Coca-Cola*, 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010)). So "[a]t the class certification stage, plaintiffs may demonstrate that [causation and injury under the GBL] are susceptible to generalized proof by disclosing a suitable methodology" to quantify this alleged price premium. *See Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *6 (S.D.N.Y. Aug. 5, 2010).

Plaintiffs propose to use a choice-based conjoint survey conducted Dr. William Robert Ingersoll, Dkt. 71-36, to prove the existence of a price premium. "In such a survey, respondents

9

are presented with a series of questions and asked to select 'the most preferred product among several available options with different attributes.'" *Allegra*, 341 F.R.D. at 451 (citation omitted). Ingersoll's survey tested four attributes: brand, alcohol type, size, and price. Dkt. 71-36 ¶ 34. The brand was either "Southern Comfort" or a generic alternative, and the "alcohol type" was either whiskey or malt. *Id.* After analyzing the results of his survey, Ingersoll concluded that "a belief that the alcohol type used [in a bottle of Southern Comfort] is Whisky (Distilled Spirit), when it was actually Malt, would result in 8.8% of the price being a price premium due to that belief. Without that belief, price for the product would have been reduced by 8.8% of that price for all purchasers." *Id.* ¶ 91. In other words, "purchasers faced a market price that should have been at least 8.8% lower had the deceptive label not been used." *Id.* ¶ 92.

As a threshold matter, Sazerac says that Ingersoll's opinion doesn't satisfy Federal Rule of Evidence 702, which governs the admissibility of expert evidence. *See* Dkt. 78 at 20. (It doesn't move to exclude his report under Rule 702, nor does it frame its objections under that rule.) "Although the Supreme Court has not definitely resolved 'the extent to which a district court must undertake a *Daubert* analysis at the class certification stage,' it has suggested in *dicta* that such an analysis is appropriate." *Molly C. v. Oxford Health Ins., Inc.*, 2024 WL 4850813, at *7 (S.D.N.Y. Nov. 21, 2024) (first quoting *In re U.S. Foodservice*, 729 F.3d at 129; and then citing *Wal-Mart*, 564 U.S. at 354). At the class certification stage, however, "the *Daubert* inquiry extends only to the issues 'necessary to the Rule 23 analysis.'" *Id.* (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 471 (S.D.N.Y. 2018)). So "the Court need only consider the portions of [Ingersoll's] declaration[] relied on by plaintiffs to demonstrate [predominance]." *Id.*

As far as the Court can tell without any briefing from the parties on Rule 702, those portions of Ingersoll's proposed testimony are admissible. Ingersoll is a statistician, economist, and professor who has testified in numerous other cases. *See* Dkt. 71-36 at 23, 26. The survey methods and statistical analysis Ingersoll describes in his report are frequently used in calculating price premiums. *See, e.g.*, *Sharpe*, 2021 WL 3721392, at *7–9. And although defendants object that Ingersoll failed to adequately define certain terms in the survey or limit the survey to Southern Comfort malt purchasers, *see* Dkt. 78 at 6–8, these arguments "ultimately go to the weight" of Ingersoll's model and so are "are fodder for cross-examination, not exclusion." *In re Scotts EZ Seed Litig.*, 2017 WL 3396433, at *8 (S.D.N.Y. Aug. 8, 2017) (citation omitted).

The next question is whether Ingersoll's model sufficiently demonstrates that damages can be measured by classwide proof. Here, plaintiffs must satisfy the requirements set forth in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). *See, e.g.*, *Allegra*, 341 F.R.D. at 457. "[T]o satisfy predominance under Rule 23(b)," *Comcast* requires that a plaintiff "put forth a damages model that measures 'only those damages attributable to [their] theory' of liability." *Id.* (alteration in original) (quoting *Comcast*, 569 U.S. at 35–37). Sazerac says that Ingersoll's analysis doesn't measure plaintiffs' theory of liability because it fails to (1) show that the price premium is attributable to the beverage's misleading packaging or (2) consider supply-side factors. The Court considers each argument in turn.

10

### *1. Failure to Isolate the Misrepresentation*

Sazerac says that Ingersoll's analysis fails to account for two factors that are "the primary drivers of SoCo Malt purchase intent: flavor and convenience." Dkt. 78 at 17. Ingersoll couldn't have accounted for the latter factor, says Sazerac, because he asked survey participants to imagine that both products were sold at the same store. Sazerac also says that by using the term "malt," Ingersoll "may well have measured relative preference for whiskey over beer or beverages that taste like beer." *Id.* at 16. Based on these deficiencies, Sazerac says that Ingersoll's model doesn't satisfy *Comcast*.

The Court disagrees. All that is required under *Comcast* is a match between plaintiffs' theory of liability and the damages measured by its model. *See Roach*, 778 F.3d at 407 ("*Comcast* 'simply' requires that a damages calculation reflect the associated theory of liability . . . . (quoting *In re Nexium Antitr. Litig.*, 777 F.3d 9, 23 (1st Cir. 2015))). Plaintiffs' damages model satisfies *Comcast* because it "purports to measure the price premium attributable to the [Southern Comfort packaging]." *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (holding that plaintiffs' damages model complied with *Comcast* because it was "directly linked with their underlying theory of classwide liability" (citation omitted)); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015) ("Plaintiffs' model survives the minimal scrutiny required under *Comcast* and Rule 23(b)(3)—their theory of liability matches their theory of damages and individualized damages issues will not predominate.").

True, "[c]ourts routinely reject price premium methodologies under *Comcast* when the proposed methodologies do not attempt to isolate the premium due only to the allegedly misleading marketing statement." *Famular v. Whirlpool Corp.*, 2019 WL 1254882, at *11 (S.D.N.Y. Mar. 19, 2019). For example, in *Price v. L'Oréal USA*, 2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021), the court rejected a conjoint analysis that combined "Keratindose" and "Pro-Keratin" with "+ Silk," because "the analysis d[id] not tell the Court whether the survey respondents would pay a price premium because the product is advertised as containing keratin, because it is advertised as containing silk[,] or a combination of the two." *Id.* at *5. Similarly, in *Passman*, the court rejected a conjoint analysis that isolated the price premium attributable to the phrase "ever-growing library of classes." 671 F. Supp. 3d at 459. The plaintiffs' theory was that consumers specifically derived value from the phrase "ever-growing." *Id.* The "model does not prove that theory," the court explained, "because it does not disentangle the library of classes that was Peloton's innovation from the fact that this library was 'ever-growing.'" *Id.*

But that is not an issue here. Plaintiffs don't challenge one discrete feature of the malt-beverage packaging as misleading. Instead, in plaintiffs' view, consumers derived value from the overall Southern Comfort whiskey packaging. Ingersoll's model does not "indisputably 'fail[] to measure'" this theory of liability. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (quoting *Comcast*, 569 U.S. at 36); *see also Allegra*, 341 F.R.D. at 458 ("Unconvincing as [defendants] may ultimately prove [a model based on a choice-based conjoint survey] to be, it does purport to measure damages attributable to Plaintiffs' theory of liability.").

11

Instead, Ingersoll's model fails to measure *defendants'* theory—that consumers paid a premium because it was more convenient to purchase or they preferred the flavor of the malt beverage. But Second Circuit case law is clear that a model can satisfy *Comcast* even if it doesn't account for every "possible source[] of a price premium" identified by defendants. *Kurtz*, 818 F. App'x at 62. In *Kurtz*, the defendants challenged a damages model under *Comcast* on the ground that it "fail[ed] to account for major variables, including attributes that consumers value most." *Id.* The court rejected this argument, explaining that "[t]he fact that [the] model may fail to account for other possible sources of a price premium simply means that [the] model may not ultimately prove Plaintiffs' claim. But it still serves as common evidence of plaintiffs' theory of injury and does not run afoul of *Comcast*." *Id.*

So too here. Sazerac may prevail at summary judgment or trial by introducing competing evidence that convenience and preference drive malt-beverage purchasing behavior, but it can't defeat class certification on these grounds. If Ingersoll's model missed the mark, then it did so in one fell swoop for the entire class. That is a common classwide issue, even if the class may lose on that issue at the end of the day.

### 2. *Supply-Side Factors*

Sazerac also argues that Ingersoll's model is fatally flawed because it measures only consumers' willingness to pay, and not the supply-side factors that impact a product's price. Dkt. 78 at 19; *see also In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (rejecting under *Comcast* a model that focused "solely on the consumer's subjective valuation" "without considering other factors in a functioning marketplace").

Sazerac is correct that some courts have rejected conjoint analyses as evidence of a price premium on the ground that they "measure[] consumers' private valuations" of a product and not "the *market value* of" the product itself. *See In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 236–37 (S.D.N.Y. 2019) (collecting cases); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018) ("[I]n cases where price premia are the relevant measure of damages, courts have repeatedly rejected conjoint analyses that only measure demand-side willingness-to-pay."). "However, courts have also found that conjoint analyses can adequately account for supply-side factors—and can therefore be utilized to estimate price premia without running afoul of *Comcast*—when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period." *Hadley*, 324 F. Supp. 3d at 1105.

That's the case here. In designing his survey, Ingersoll used pricing data generated from "actual market transactions in New York," obtained from Circana, a consumer data company. Dkt. 71-36 ¶¶ 39–40, 43. "That empirical data 'tether[s]' [Ingersoll's] opinion 'to actual market conditions, including pricing and premiums.'" *Hasemann v. Gerber Prods. Co.*, 2024 WL 1282368, at *18 (E.D.N.Y. Mar. 25, 2024) (first alteration in original) (citation omitted).

12

Still, Sazerac's expert, David Reibstein, says that this historical pricing data is insufficient to account for supply-side factors. According to Reibstein,

> The actual prices included by Dr. Ingersoll in his conjoint survey reflect the equilibrium prices of Southern Comfort malt products given the set of marketplace offerings *in the actual world*. That is, these prices incorporate *historical* best responses of each competitor in the marketplace. However, . . . a competitor's optimal response (*i.e.*, the chosen price) may change once the set of competing product offerings changes. To determine the value of the challenged label, one needs to recompute the equilibrium price in a counterfactual world where the at-issue Southern Comfort products are no longer alleged to be deceptive.

Dkt. 77-5 ¶ 103.

Some courts have been receptive to this argument. In *Passman*, for example, the court rejected a conjoint analysis under *Comcast* because the model did not account for "the supply-side factors in the but-for world where Defendant did not use the Challenged Statement," nor did it "consider how competitors would have reacted to a decrease in demand for Peloton products, which could in turn affect the supply of Peloton products." 671 F. Supp. 3d at 465. But this Court agrees with the majority of decisions that, at least for class-certification purposes, hold that relying on real-world historical pricing data suffices to account for supply-side factors in a "classic mislabeling" case. *See In re Gen. Motors*, 407 F. Supp. 3d at 238–39 (collecting cases); *see also Sharpe*, 2021 WL 3721392, at *7–8 (explaining why historical data is particularly appropriate for mislabeling cases); *In re Folgers Coffee, Mktg. Litig.*, 2024 WL 4068851, at *6 n.12 (W.D. Mo. July 31, 2024) (declining to adopt *Passman*'s reasoning because the court "relied exclusively on the defendant's expert and did not address the many cases that have found historical sales and market data are sufficient"). After all, "[a] conjoint survey that asks respondents whether they would rather pay *x* for a product labeled '100% Fruit Juice' or *y* for a similar product labeled '50% Fruit Juice' . . . would account for supply-side factors if both *x* and *y* reflect the prices for which juice companies actually sell similarly labeled products in the marketplace." *In re Gen. Motors*, 407 Supp. 3d at 239. Because Ingersoll only used objective pricing data, the risk identified in cases like *General Motors*, that a proposed analysis would only measure "consumers' *subjective* valuation or willingness to pay," *id.* at 237 (emphasis added), is not presented. Instead, the pricing data reflects that the options presented to consumers were real products, with the stated attributes, sold at the prices indicated, all of which go to the supply-side of the equation.

Nevertheless, Sazerac says that Ingersoll's use of historical pricing data doesn't pass muster because he has no evidence that Sazerac would actually sell its malt beverage at the lower price of a generic competitor. Sazerac points to an affidavit from its former CEO, Mark Brown, who says that "even if demand for Southern Comfort malt beverage were to fall, Sazerac would not change its [prices]" because doing so would "antagonize or alienate" its distribution network. Dkt. 75-4 ¶ 9; *see also* Dkt. 78 at 19. "A factfinder may ultimately agree" that the model fails to capture such "business considerations." *Kurtz*, 818 F. App'x at 62. "But if that is the case, then the class claims will fail as a unit." *Id.*; *see also Lessin v. Ford Motor Co.*, 2004 WL 5007092, at *5 (S.D. Cal. Oct. 31, 2024) (holding that whether conjoint survey sufficiently accounted for supply-side factors by

13

using historical pricing data was a merits question for the factfinder). Moreover, it would be improper to give Sazerac the benefit of the doubt—and to take its CEO's self-interested statements as controlling—at this stage. Rather, at summary judgment the Court will determine whether there is a triable issue of material fact, based on the entire record and the applicable legal standards, including the requirement to construe the evidence "in the light most favorable" to the nonmoving party and to "draw[] all inferences in that party's favor." *Northway Med. Ctr. Condo v. Sentinel Ins. Co.*, 2025 WL 1703194, at *1 (2d Cir. June 18, 2025) (quoting *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021)).

In sum, Ingersoll's conjoint analysis "provides an acceptable, though likely imperfect" method of measuring the damages attributable to plaintiffs' theory of liability. *See Hasemann*, 2024 WL 1282368, at *18. None of this means that plaintiffs will prevail at the merits stage. Most of Sazerac's arguments are really for summary judgment, not class certification. At summary judgment, the factual issues described above may come out in Sazerac's favor. And Sazerac may formally move to exclude the testimony of plaintiffs' experts under Rule 702 at that time. *See* Dkt. 78 at 20 n.10 ("Sazerac reserves for future argument a full discussion of the admissibility of the Matthews and Ingersoll Reports under Fed. R. Evid. 702."). All the Court has concluded is that plaintiffs have carried their burden of showing that common questions predominate over individual ones.

## VI. Superiority

Plaintiffs say that a class action is the "superior" method for "fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), because "proceeding individually would be prohibitive for class members with small claims." *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010). Sazerac doesn't object, and the Court agrees: when, like here, there are thousands of potential class members with small claims, and those claims are capable of resolution through classwide proof, "the class action device is . . . superior to individual actions." *See id.*

## CONCLUSION

For these reasons, the Court certifies a class of all persons who purchased the Southern Comfort malt products in the State of New York at any time during the period February 8, 2020, to the date of judgment. Khan's lawyers, Charles D. Moore, Neal Jamison Deckant, and Spencer Sheehan, are appointed as class counsel.

SO ORDERED.

Dated: July 1, 2025
New York, New York

                                                                ARUN SUBRAMANIAN
                                                                United States District Judge