UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILBERT ANDREWS and STEVEN KAHN, individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

SAZERAC COMPANY, INC.,

Defendant.

23-cv-1060 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

**BACKGROUND**

Plaintiffs allege that defendant Sazerac Company, Inc. ("Sazerac") engaged in a scheme of liquor look-alike. Specifically, they say that Sazerac designed the malt-based version of its Southern Comfort-branded alcohol line ("Southern Comfort Malt") to resemble the whiskey version it sells under the same name ("Southern Comfort Whiskey"). Dkt. 64 ¶¶ 13, 24.

The complaint states that the "colors, themes, fonts, symbols[,] and spacing" of the malt-based product are "identical" to that of Southern Comfort Whiskey. *Id.* ¶ 15. This practice is "deceptive," plaintiffs contend, because purchasers of malt-based Southern Comfort are duped into buying a "lesser quality" product that contains "less alcohol" than their whiskey drink of choice. *Id.* ¶¶ 45–51. On this basis, plaintiffs claim that Sazerac misled consumers in violation of New York General Business Law Sections 349 and 350. *Id.* ¶¶ 62–83.

In September 2023, Sazerac moved to dismiss the claims—at the time brought by a different named plaintiff—arguing that they were preempted. Dkt. 39. The Court denied the motion to dismiss after holding that Sazerac had not met its "heavy" burden of showing that plaintiffs' claims were preempted by federal law. *See Del Rosario v. Sazerac Co.*, 2023 WL 6318083, at *2–3 (S.D.N.Y. Sept. 28, 2023).

Sazerac now moves for summary judgment, pressing that plaintiffs' evidence is insufficient to establish two essential elements of their claims. Dkt. 114 at 1–2. In advancing its motion for summary judgment, Sazerac also filed two motions seeking to exclude the testimony of plaintiffs' expert witnesses. Dkt. 115–16. Plaintiffs dispute Sazerac's contentions and have also moved to exclude a host of Sazerac's submissions. Dkt. 131. The Court proceeds with these dueling motions in mind.

## LEGAL STANDARDS

On a motion for summary judgment, a movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a "genuine issue of material fact" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If "the burden of persuasion at trial would be on the non-moving party," the movant may "satisfy his burden of production under Rule 56" by either (1) "submitting evidence that negates an essential element of the non-moving party's claim" or (2) "demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Id.* at 114 (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

Under Federal Rule of Evidence 702 and *Daubert*, the proponent of expert testimony must show that the "witness . . . is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 539 (S.D.N.Y. 2004) ("[Rule 702] incorporates principles established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, in which the Supreme Court charged trial courts with a gatekeeping role to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." (cleaned up)). To do so, the proponent must demonstrate "that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

## DISCUSSION

Sazerac's motion for summary judgment is based, in part, on its motions to exclude, so the Court tackles those motions first. The Court then considers plaintiffs' motion to exclude and Sazerac's motion for summary judgment.

### I. Sazerac's motions to exclude are denied

Sazerac seeks to exclude the testimony of plaintiffs' expert witnesses: Dr. Andrea Lynn Matthews and Dr. William Robert Ingersoll. Dkts. 115–16.

#### A. <u>Sazerac's motion to exclude Dr. Matthews's testimony is denied</u>

Sazerac takes aim at two studies conducted by Dr. Matthews—the first focused on "assess[ing] consumer perceptions of the type of alcohol in" Southern Comfort Malt (the "Perception" study), Dkt. 71-35 ¶ 129; the second designed to determine "the extent to which consumers preferred to purchase alcoholic beverages that contain distilled spirits versus malt-based alcohol" (the "Preference" study), *id.* ¶ 141. But its arguments amount to flyspecking; Sazerac takes the position that anything it would have done differently renders Dr. Matthews's work unreliable and inadmissible. (For instance, Sazerac claims that asking survey participants what they "expect" is

in a product rather than what they "understand" is in it renders the question invalid, Dkt. 118 at 12.) These arguments are unpersuasive.

Sazerac first takes issue with the population that Dr. Matthews surveyed. It says that this population—New Yorkers over the age of 21 who have purchased any alcoholic beverage in the past 12 months—"violates the primary tenet of survey research that the survey population should be comprised of consumers likely to purchase the product at issue." Dkt. 118 at 5. In Sazerac's view, because the surveys include responses from purchasers of any alcoholic beverage rather than just purchasers of drinks in the Southern Comfort line, the population surveyed is overbroad and both studies should be excluded. The Court disagrees. As an initial matter, whether or not respondents previously purchased Southern Comfort products, it would seem like alcohol purchasers in general would be a reasonable consumer group to test for preferences and perceptions, given that they are the audience that Sazerac is targeting to buy its products. And for another thing, the studies specifically compare the results of the surveyed population to the results of those individuals "who had previously purchased Southern Comfort branded products." Dkt. 71-35 ¶¶ 36–47. In any event, "[t]o the extent that this universe of respondents is overbroad, it is not so overbroad as to destroy the relevance of the survey results." *Rise-N-Shine, LLC v. Duner-Fenter*, 2015 WL 876470, at *3 (S.D.N.Y. Feb. 28, 2015).

Sazerac next brings several charges against Dr. Matthews's Perception study. First, Sazerac contends that the study is unreliable because it (a) did not approximate "real-world" conditions where consumers would be purchasing the product in "a grocery or convenience store," Dkt. 118 at 6–7, and (b) lacked a control group, *id.* at 10. But the Perception study began by asking respondents "to imagine that they were at the convenience store," Dkt. 71-35 ¶ 129, and it did include a control group, *id.* ¶¶ 32–35. Sazerac then challenges (1) the study's use of a "blurry," "static image" of a 50 ml bottle of Southern Comfort Malt, which is curved in design, unlike the 100 and 355 ml versions of the drink, Dkt. 118 at 6, and (2) the wording of the study's answer choices, which Sazerac argues improperly led participants to select certain answers over others (that is, the wording created a "demand effect"), *id.* at 11. These challenges (which are supported only by citation to Sazerac's own expert reports) do not impugn the "reliability" of the study, at least for purposes of threshold admissibility.

As to the image of Southern Comfort Malt, it is not so blurry as to justify throwing out the entire study (the poorer quality image featured in the motion to exclude, moreover, appears to be the result of Sazerac having distorted the original image's dimensions, *contrast* Dkt. 71-35 ¶ 136, *with* Dkt. 118 at 8). This is a factual dispute that can be properly put before a jury. *See Lego A/S v. Zuru Inc.*, 827 F. Supp. 3d 313, 393 (D. Conn. 2026) (finding argument that images in a survey were "small" and "difficult to see" went to "weight" not admissibility). The same logic applies to the fact that the image shown in the survey was of a curved bottle rather than a flat one—the jury will have all the bottles before it at trial and can decide whether differences among the bottles render the survey undependable. *See Think Green Ltd. v. Medela AG*, 2025 WL 1826137, at *7 (N.D. Ill. July 2, 2025) ("[W]hether a survey's images are too small or otherwise unclear is an objection for a jury to hear, not a basis for excluding survey results altogether."). And notably,

despite the difference in bottle shape, the 50 ml version has a label that shares many elements with the labels on the 100 and 355 ml bottles, such as the typeface and relative sizes of the adorning text. *See* Dkt. 119-6; 119-7; 119-8.

As to the form of the survey's questions, while it is of course important to minimize demand effects—those "cues from [a] survey['s] procedures and questions" that "steer" respondents "to the desired response," 5 McCarthy on Trademarks and Unfair Competition § 32:172 (5th ed. 2021)—the alleged problem here (inclusion of a proposed answer that is longer than others) is not enough to render the study unreliable. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) ("[T]he format of the questions [in a survey] . . . bear on the weight of the evidence, not its admissibility." (quoting *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988))); *cf.* Itamar Simonson and Ran Kivetz, *Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions*, Trademark and Deceptive Advertising Surveys: Law Science and Design 243, 244 (2012) ("Although demand characteristics are *likely to be present to some degree in most surveys* and experiments . . . this chapter focuses on *more severe* demand effects . . . that can largely determine and significantly bias survey findings." (emphases added)).

Finally, Sazerac brings three challenges against Dr. Matthews's Preference study. These arguments largely suffer from the same problems as those brought against her Perception study—they contest certain aspects of the survey's format, but don't raise issues so serious as to compromise the reliability of the study under Rule 702.

First, Sazerac argues that "the preference study is based on a leading question" because it describes Alcohol A as "contain[ing] whiskey" and Alcohol B as "not contain[ing] whiskey." Dkt. 118 at 12 (capitalization altered). In other words, Sazerac protests that the study "describes what Alcohol A contains while emphasizing what Alcohol B *does not* contain." *Id.* But as stated above, the potential "demand effect" this question may have generated speaks only to the survey's probative value. *See Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 598 (S.D.N.Y. 2018) (determining that "any issues regarding the phrasing of the[] questions" at issue, which were labeled "leading," "are factored into the weight to be given to the evidence, not to its admissibility" (cleaned up)).

Second, Sazerac complains that the survey asks participants to choose between two products that are described by both their ABV and their alcohol type (whiskey vs. malt), and that, as a result, "the survey cannot reliably answer . . . if respondents prefer spirit-based Southern Comfort . . . because of the ABV or because of the type of base alcohol." Dkt. 118 at 12–14. But Sazerac does not offer a clear explanation for why this makes the survey "meaningless." *Id.* at 13. Southern Comfort Malt is different from Southern Comfort Whiskey on both dimensions. And the two factors (ABV and alcohol type) are generally linked. Putting both variables together is a natural fit.

Finally, Sazerac claims that "[t]he Preference Study assumes away the importance of convenience" by "instruct[ing] respondents to 'imagine' that both [a] 'Whiskey' product and [a]

'Malt Beverage' product were sold at the same store'" before asking them which product they would purchase, if any. *Id.* at 9–10 (citing Dkt. 71-35 ¶¶ 100–03). According to Sazerac, this instruction makes the survey unreliable because "the pertinent question is whether consumers would or would not place a higher value on spirit-based Southern Comfort that required a trip to a liquor store with limited operating hours than they would on malt-based Southern Comfort available where and when they wanted to purchase it." *Id.* at 10. But as explained above, the purpose of the study was to examine the "extent to which consumers preferred to purchase alcoholic beverages that contain distilled spirits versus malt-based alcohol" *in general*. Dkt. 71-35 ¶ 141. And as explored below, *see infra* Section III.A, Sazerac's challenge improperly assumes that consumers necessarily know where they can and cannot buy liquor—a question of fact that is hotly disputed by plaintiffs.

B. <u>Sazerac's motion to exclude Dr. Ingersoll's testimony is denied</u>

Sazerac also seeks to exclude Dr. Ingersoll's testimony, arguing that he is unqualified, that his testimony would not assist a jury in understanding the evidence, and that his testimony is based on unreliable principles and methods. *See* Dkt. 116. Specifically, it finds fault with the "conjoint survey" Dr. Ingersoll conducted.

*i. Background*

Before diving into the merits, a bit of background on conjoint surveys is helpful. In a conjoint survey, participants "are presented with a series of questions and asked to select 'the most preferred product among several available options with different attributes.'" *Allegra v. Luxottica Retail North America*, 341 F.R.D. 373, 451 (E.D.N.Y. 2022); *see also, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 234 (S.D.N.Y. 2019). "The researcher then uses the data from that survey to quantify how much various features of a product contribute to its total value to consumers." *Hasemann v. Gerber Prods. Co.*, 2024 WL 1282368, at *17 (E.D.N.Y. 2024); *see also* Dkt. 71-36 ¶ 16. In this way, conjoint surveys can estimate the "price premium" that results from an allegedly deceptive practice—that is, how much the "price of a product is artificially raised by deceptive or fraudulent claims." *In re Amla Litig.*, 328 F.R.D. 127, 138 (S.D.N.Y. 2018); *see Sharpe v. A&W Concentrate Co.*, 2021 WL 3721392, at *7–9 (E.D.N.Y. July 23, 2021).

Here, Dr. Ingersoll's survey showed survey respondents a set of "products" and asked them which product, if any, they preferred. Dkt. 71-36 ¶¶ 16, 34. Each product was given corresponding "attributes"—brand name, alcohol type, size, and price—with varying "levels." *Id.* ¶ 19. For instance, a respondent might have been asked whether they preferred Product #1, Product #2, or neither, where Product #1 is a 3.4 oz malt-based drink that is sold under the fictional "First Choice" brand at $2.02 and Product #2 is a 1.7 oz whiskey-based drink that is sold under the "Southern Comfort" brand at $1.33. *Id.* ¶ 36. By asking thousands of such questions, *id.* ¶ 21, and "using a Hierarchical Bayes . . . estimation," *id.* ¶ 51, Dr. Ingersoll claims that he can discover whether a customer's misperception that Southern Comfort Malt is Southern Comfort Whiskey results in a price premium, *id.* ¶ 14; Dkt. 130 at 1. After analyzing the results of his survey, Ingersoll concluded

that "a belief that the alcohol type used [in a bottle of Southern Comfort] is Whisky (Distilled Spirit), when it was actually Malt, would result in 8.8% of the price being a price premium due to that belief." Dkt. 71-36 ¶ 91. In other words, Dr. Ingersoll found that "purchasers [of Southern Comfort Malt] faced a market price that [would] have been at least 8.8% lower had the deceptive label not been used." *Id*. ¶ 92.

*ii. Dr. Ingersoll is qualified*

Sazerac first argues that, because "Dr. Ingersoll had never conducted a conjoint survey prior to this matter," he is unqualified "to testify regarding conjoint surveys—including his own." Dkt. 117 at 5; *see* Dkt. 119-13 at 11.

But even though he may not have conducted this exact type of survey in the past, the Court agrees with plaintiffs that Dr. Ingersoll need "not possess experience tailored to the precise . . . process that is the subject matter of the dispute." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) (quoting *Yaccarino v. Motor Coach Indus., Inc.*, 2006 WL 5230033, at *9 (E.D.N.Y. Sept. 29, 2006)). Rather, his training and knowledge in similar subjects can serve to qualify him to conduct this type of study. Dr. Ingersoll is a statistician who holds a PhD in economics and specializes in econometrics and behavioral economics. Dkt. 71-36 at 23–26. He has been trained "in the creation and analysis of discrete choice models." *Id.* ¶ 8. He thus is equipped to conduct a choice-based conjoint survey, which is sometimes referred to as a discrete choice experiment. *Id.* ¶ 16 n.1; Dkt. 119-13 at 14:18–14:19 ("[D]iscrete choice experiments are basically choice based conjoints."); *Allegra*, 341 F.R.D. at 451. Moreover, Sazerac fails to explain why conducting a conjoint survey is so difficult that an experienced statistician, like Dr. Ingersoll, would be unable to competently perform one—particularly after sufficient preparation (he read multiple books and academic papers on the subject, Dkt. 119-13 at 14:9–14:16). For instance, while it's perhaps fair to say that an experienced bicyclist wouldn't be able to ride a motorcycle, despite the similarities between the two vehicles, it's something else entirely to say that such a bicyclist wouldn't be able to ride a tricycle. And Sazerac fails to explain why a conjoint survey is the former, not the latter.

*iii. Dr. Ingersoll's methodology is reliable*

Next, Sazerac argues that Dr. Ingersoll's survey "employed improper methodologies" and is thus unreliable. Dkt. 117 at 6. The Court takes each of Sazerac's arguments in turn.

First, just as it did with Dr. Matthews's survey, Sazerac contends that Dr. Ingersoll's survey is "entirely irrelevant" because the population surveyed wasn't limited to "actual purchasers of Southern Comfort [M]alt or even reasonably prospective purchasers of Southern Comfort [M]alt." Dkt. 117 at 6–7. Instead, survey respondents were "residents of the state of New York over the age of 21 who had purchased Southern Comfort" (either Malt or Whiskey) "for their own personal consumption in the last 12 months." Dkt. 71-36 ¶ 23. The Court disagrees that purchasers of "Southern Comfort" branded drinks are not "reasonably prospective purchasers" of Southern Comfort Malt. If, indeed, customers of Southern Comfort Whiskey are likely to mistake Southern Comfort Malt for their drink of choice, it seems reasonable to conclude that they constitute

prospective purchasers of Southern Comfort Malt. At the very least, it does not make the survey's results "entirely irrelevant." *Id.* at 7; *see Rise-N-Shine, LLC*, 2015 WL 876470, at *3.

Second, Sazerac presses that the survey "ignored the importance of convenience, rendering [its] results meaningless." Dkt. 117 at 8. Specifically, it highlights that the survey didn't indicate whether the products were in convenience stores or liquor stores (remember, it only tested for brand name, alcohol type, and size). Therefore, because "it is likely" that consumers who purchase Southern Comfort Malt value it "*more highly* than [Southern Comfort Whiskey] precisely because the malt-based version is more convenient and available for purchase," the survey, according to Sazerac, tells us nothing and is "entirely irrelevant." *Id.* at 9. The survey, however, does show something relevant: it shows, at least arguably, that consumers place a premium on whiskey over malt irrespective of brand name or size. While Sazerac is free to introduce evidence that any such preference is outweighed by a customer's penchant for convenience, this argument is more appropriately presented as part of a battle of the experts at trial. *See Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) ("We acknowledge that Weir's model fails to consider some arguably significant variables, but, normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *Allegra*, 341 F.R.D. at 455 ("[F]ailing to consider certain variables or attributes relevant to consumer preference . . . go[es] to the weight and not admissibility of the model.").

Finally, Sazerac brings a series of challenges in passing—each little more than a paragraph long—claiming that "Dr. Ingersoll's survey is rife with severe methodological flaws." Dkt. 117 at 9–13. But these arguments are supported solely by reference to Sazerac's own expert reports and do not show methodological flaws that, even taken together, call for the exclusion of Dr. Ingersoll's testimony. For instance, Sazerac contends that, because the survey "does not define" what "malt" is, the results of the survey do not "reliably measure respondents' relative valuations of [Southern Comfort Malt] (which uses a flavorless malt alcohol base and tastes the same as [Southern Comfort Whiskey])." Dkt. 117 at 10–11. This argument—that the uniqueness of the malt in Southern Comfort Malt means a consumer's preference for "whiskey" over generic "malt" is meaningless—is not a winning one at this stage of litigation. Malt is malt. If Sazerac wishes to argue that the specific version it uses justifies the price it charges, it can present that case to the jury. But the claim that survey participants associate the word "malt" with a variant of "beer" merely highlights that consumers associate malt with a purportedly lower quality drink. If anything, this supports, rather than undermines, plaintiffs' claims of injury.

*iv. Dr. Ingersoll's survey reflects a price premium*

In a final effort to exclude Dr. Ingersoll's survey, Sazerac contends that "[e]ven if [it] reliably measured relative consumer preferences for [Southern Comfort Whiskey] and [Southern Comfort Malt] . . . such *preferences* do not equate to a price premium." Dkt. 117 at 13–17. It raises two arguments in support: (a) that Dr. Ingersoll did not consider supply-side factors and (b) that his assumptions were contrary to the evidence.

Sazerac has raised its supply-side-based argument before. In opposing class certification, Sazerac stated that "Ingersoll's model is fatally flawed because it measures only consumers' willingness to pay, and not the supply-side factors that impact a product's price." Dkt. 99 at 12. But the Court continues to agree that "relying on real-world historical pricing data suffices to account for supply-side factors in a 'classical mislabeling' case." *Id.* at 13 (citing *In re Gen. Motors*, 407 F. Supp. 3d at 238). And contrary to Sazerac's arguments, this is a "classical mislabeling case." Dkt. 117 at 15. In support of its argument, Sazerac points to the following statement from *General Motors*:

> [A] conjoint survey that asks respondents whether they would rather pay *x* for a product labeled "100% Fruit Juice" or *y* for a similar product labeled "50% Fruit Juice," for example, would account for supply-side factors if both *x* and *y* reflect the prices for which juice companies actually sell similarly labeled products in the marketplace.

407 F. Supp. 3d at 239.

Sazerac argues that the same "situation does not exist here" since "*y* (the price of [Southern Comfort Malt] with a 'this is not whiskey' label) is not" known. Dkt. 117 at 15. This misunderstands *General Motors*. It need not be the case that "*y*" is the exact hypothetical product (the same in every way but lacking the alleged mislabeling) for a conjoint survey to account for supply-side factors. (Indeed, it's only the rare case where a company sells two versions of the same product, one with a deceptive label and one without.) Rather "*y*" need only reflect the prices of "similarly labeled products." *In re Gen. Motors LLC*, 407 F. Supp. 3d at 239. And here, Ingersoll did exactly that by basing the survey on "prices that occurred in the real world" as relayed from data obtained from Circana, a consumer data company. Dkt. 71-36 ¶¶ 40, 43; *see Benson v. Newell Brands, Inc.*, 2025 WL 3454980, at *5 (N.D. Ill. Dec. 1, 2025) (finding that expert's reliance on "historical market data from a renowned data analytics and market research company" "account[ed] for supply-side factors"); *In re Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016) (admitting survey where the expert "'consulted pricing of the Lenovo models at issue, as well as comparable PC laptops' to ensure that the results would 'reflect the market,' and addressed 'the supply side' of the market"); *Banks v. R.C. Bigelow, Inc.*, 2023 WL 4932894, at *8 (C.D. Cal. July 31, 2023) ("Weir used actual historic prices and quantities as the basis for his survey, thus sufficiently accounting for supply-side factors.").

Finally, Sazerac claims that "even if demand for [Southern Comfort Malt] were to fall 8.8 percent," the price would remain the same given that the company "line-prices" its malt- and whiskey-based products (meaning that it prices the products the same) and because "Sazerac faces constraints that prevent it from reducing" prices. Dkt. 117 at 16–17. In support, Sazerac cites comments by Sazerac's Executive Chairman, Mark Brown. *Id.* The jury, however, might discount Brown's testimony, especially given that he is a Sazerac insider. Indeed, the jury could determine that Sazerac prices Southern Comfort Malt and Southern Comfort Whiskey the same not because it "line prices" its products, but because it is trading on customers' erroneous belief that Southern Comfort Malt is Southern Comfort Whiskey (that is, after all, plaintiffs' theory of the case).

Similarly, the jury could determine that the "constraints" testified to by Brown either don't exist or aren't strong enough to prevent Sazerac from reducing its prices on Southern Comfort Malt should demand fall the way Dr. Ingersoll predicts it would.

For these reasons, Sazerac's motion to exclude Dr. Ingersoll's testimony is denied.

## II. Plaintiffs' motion to exclude is denied; but the witnesses should be made available for deposition

Plaintiffs seek the exclusion of a declaration by Adam Wilkins, Dkt. 113-2; a declaration by Danny Suich, Dkt. 113-3; a declaration by Natalie Cianci and related exhibits, Dkts. 118; 119-2, -6, -8; a declaration by Jessica Figueroa and related exhibits, Dkts. 113-6–8; and a declaration by James Restivo and related exhibits, Dkts. 113-9–10. Plaintiffs don't want the Court to consider these materials in addressing Sazerac's motion for summary judgment. But because the Court denies Sazerac's summary-judgment motion, plaintiffs' motion is denied as moot. *See Darley v. United States*, 2025 WL 1159518, at *6 (S.D.N.Y. Apr. 21, 2025). However, the declarants should be made available for deposition if Sazerac plans on having them testify at trial.

## III. The motion for summary judgment is denied

The Court now turns to Sazerac's motion for summary judgment. Dkt. 114.

New York General Business Law Section 349 prohibits "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce." Similarly, New York General Business Law Section 350 proscribes "[f]alse advertising in the conduct of any business, trade or commerce." To succeed on either claim, plaintiffs must prove three elements: (1) "that the challenged act or practice was consumer-oriented"; (2) "that [the act or practice] was misleading in a material way"; and (3) "that the plaintiff[s] suffered injury as a result of the deceptive act" or practice. *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000); *see Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015).

Sazerac argues that plaintiffs' evidence is insufficient to establish either of the latter two elements. Dkt. 113 at 1–2. The Court disagrees.

### A. <u>Southern Comfort Malt's label and point of sale do not preclude plaintiffs' claims</u>

Sazerac begins by arguing that Southern Comfort Malt's front label "affirmatively state[s] . . . that the product is a 'MALT BEVERAGE' with a 21% ABV" and the product is sold "exclusively at retailers that do not sell distilled spirits" (like Southern Comfort Whiskey), and so "[p]laintiffs cannot state an actionable claim under either" Section 349 or Section 350. Dkt. 113 at 2–5. The Court is unpersuaded.

This argument is based on *Bates v. Abbott Laboratories*, a summary order issued by the Second Circuit. 2025 WL 65668 (2d Cir. Jan. 10, 2025). There, the plaintiff—Bates—alleged that Abbott's "use of health and wellness statements on the labels affixed to its Ensure nutrition shakes and drinks" was "false and misleading because" the products contained a "high amount of added sugar." *Id.* at *1. Despite these allegations, the Second Circuit held that Bates had failed to state a

plausible claim. *Id.* at *2. That was so, the court reasoned, because a consumer "could read [the Nutrition Facts Panel] to discern how much sugar the product contained." *Id.* In making this determination, the court distinguished *Mantikas v. Kellogg Co.*—which held that "reasonable consumers should not be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box," 910 F.3d 633, 637 (2d Cir. 2018) (cleaned up)—based on the fact that none of the "challenged labeling statements" in *Bates* were alleged to be "affirmatively inaccurate" or "contradictory to the Nutrition Facts Panel," 2025 WL 65668, at *2. Said another way, even if the "representation on the front" of the package "might be considered ambiguous," "clarifying language" on the package's back dispelled that ambiguity. *Foster v. Whole Foods Mkt. Grp., Inc.*, 2023 WL 8520270, at *2 (2d Cir. Dec. 8, 2023).

Sazerac argues that the same logic applies here. Dkt. 113 at 2–5. It presses that "[n]othing on the front label suggests that malt-based Southern Comfort is a whisky product" and that, regardless, "the clear front-label statements that malt-based Southern Comfort is '21% ABV' and is a 'MALT BEVERAGE' would disabuse a reasonable consumer of any false impressions." *Id.* at 3–4; *see Foster*, 2023 WL 8520270, at *2 ("Even assuming that the representation on the front label might be considered ambiguous, the additional information on the . . . back label . . . definitively dispels any arguable ambiguity on the front."). The problem with this contention is that portions of Southern Comfort Malt's packaging *do* suggest that it is a whiskey product. After all, the gravamen of the complaint is that the "colors, themes, fonts, symbols[,] and spacing" of Southern Comfort Malt's packaging are "identical" to that on a bottle of Southern Comfort Whiskey, which leads consumers to see the malt-based product and immediately think it is the classic whiskey drink. *Id.* ¶ 16. This is not the same ambiguity that existed in *Bates*—where the pertinent packaging said nothing about the product's sugar conduct. Nor does the Court agree that the "difficult to see" "Malt Beverage" label on the base of the bottle necessarily dispels the false impressions a reasonable consumer may have garnered by looking at the rest of the bottle. *Id.*; *see Mantikas*, 910 F.3d at 637 (holding that "small print on the side of the box" does not necessarily cure "misleading representations on the front"); *McKay v. Sazerac Co., Inc.*, 2023 WL 3549515, at *7 (N.D. Cal. May 17, 2023) ("It is also not clear that consumers would carefully scrutinize the tiny print of 'Malt Beverage' and 'ALC 16.5% BY VOL' in light of the other flashier language and design of the packaging."); *Pizzaro v. Sazerac Co., Inc.*, 2024 WL 4290647, at *11 (S.D.N.Y. Sept. 25, 2024) ("[T]he 'Malt Beverage' disclosures are printed in very small font and are certainly overshadowed by the elements of the label that mirror the Fireball Whisky and Parrot Bay Rum labels."). The base of a bottle of alcohol is not the same as a nutrition label, which a reasonable consumer is expected to consult.

The Court also disagrees that "the context in which malt-based Southern Comfort is sold—exclusively at retailers that do not sell distilled spirits—would make plain to a reasonable consumer that the product was not a whiskey product." Dkt. 113 at 4. While "context" is indeed "crucial" in examining claims like these, *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013), Sazerac has provided nothing to demonstrate that a reasonable consumer would know that

retailers do not sell distilled spirits like Southern Comfort Whiskey. Indeed, a reasonable consumer "could well be unaware of which establishments hold which liquor license types" and "may not know that a gas station store can sell malt but not whisky." *McKay*, 2023 WL 3549515 at *7; *see Pizzaro*, 2024 WL 4290647, at *12. Dr. Matthews intends to testify to just that effect, and the record contains emails from Sazerac's own employees indicating that they thought consumers might not realize they were purchasing Southern Comfort Malt instead of Southern Comfort Whiskey. Dkt. 70-15.

B. Plaintiffs have adduced sufficient evidence that Southern Comfort Malt's label is misleading

Sazerac next argues that plaintiffs have nonetheless failed to introduce any admissible evidence demonstrating that the product's label is misleading. Dkt. 113 at 5–7. As previewed above, this argument is premised on the exclusion of Dr. Matthews's testimony, which purports to show that 62.9% of consumers "incorrectly believed" that Southern Comfort Malt contained whiskey. Dkt. 71-35 ¶ 36; *see Bustamante v. KIND, LLC*, 100 F.4th 419, 426 (2d Cir. 2024) (noting that this element "requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled"). But Sazerac didn't succeed in precluding her testimony, so this argument fails for that reason alone.

And even if Sazerac were to succeed on its motion to exclude, plaintiffs' other evidence independently "demonstrat[es] what a reasonable consumer, acting reasonably," would expect Southern Comfort Malt to contain. *Id.* at 434. First, there is evidence that the branding elements on the bottles of the two drinks are nearly identical. *See* Dkt. 68-1 at 30; *Noriega v. Abbott Lab'ys*, 2026 WL 1601501, at *28 (S.D.N.Y. June 4, 2026) ("Here, a rational juror could find that PediaSure's packaging, viewed as a whole" is misleading). Second, plaintiffs introduced internal emails that arguably chronicle how "Southern Comfort [was] following quickly on Fireball's heels" with respect to consumer confusion resulting from a similar labeling practice for the Fireball line of product. Dkt. 70-14; *see* Dkt. 70-11 (documenting Fireball customer complaints); Dkt. 70-10 (internal presentation highlighting consumer confusion surrounding Fireball products). All of this together readily permits a factfinder to conclude that a "significant portion" of consumers, "acting reasonably in the circumstances, could be misled" into thinking Southern Comfort Malt contained whiskey. *Bustamante*, 100 F.4th at 426.

C. Plaintiffs have introduced evidence that Southern Comfort Malt is misleading in a material way

Sazerac's final argument with respect to this element of plaintiffs' claims is that even if plaintiffs can show "that a significant number of consumers could be misled," they "have no evidence that" Southern Comfort Malt's labeling is "*materially* misleading." Dkt. 113 at 7. That is, it complains that plaintiffs have introduced no evidence to show that "whatever is allegedly misleading about" Southern Comfort Malt is "'significant' to a reasonable consumer." Dkt. 135 at 4 (quoting *Allegra*, 341 F.R.D. at 441). "A misrepresentation is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'" *Noriega*, 2026 WL 1601501, at *31 (S.D.N.Y. June 4, 2026) (quoting *Bildstein v.*

*MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 414 (S.D.N.Y. 2004)). Sazerac appears to be arguing that "the type of alcohol" in a Southern Comfort product is "immaterial" to a consumer's purchasing decision. Dkt. 113 at 9 (emphasis omitted). But a jury could find from the evidence highlighted above—particularly the many complaints from consumers who were upset to have purchased a malt-based version of Fireball instead of a whiskey one—that the alleged deception was material. And this comports with the commonsense intuition that people who purchase alcohol care about the type. Would James Bond complain if the bartender at Casino Royale handed him a straight vodka martini rather than a vesper? Would an old fashioned be the same even if the bartender decided to use gin?

In all, plaintiffs have introduced sufficient evidence on this element to survive summary judgment.

D. Plaintiffs have introduced evidence of actual injury

Sazerac next turns its sights to the requirement that plaintiffs must show that they "suffered injury as a result of the deceptive act." *Stutman*, 731 N.E.2d at 611. To establish this element, "plaintiff[s] must prove 'actual' injury . . . though not necessarily pecuniary harm." *Id.* at 612.

Sazerac makes two arguments on this front. The first rises and falls with its motions to exclude: Because the Court declines to exclude Dr. Ingersoll's testimony, it disagrees with Sazerac that there is a lack of admissible evidence showing a "price premium." There is, therefore, evidence demonstrating actual injury. *See Eidelman v. Sun Prods. Corp.*, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022) (noting that "[o]ne method of demonstrating actual injury in the consumable goods context is by showing that the plaintiff paid a 'price premium'").

Sazerac also argues that even if plaintiffs can show that "first-time purchasers of [Southern Comfort Malt]" can be injured, the same cannot be said about "repeat purchasers." Dkt. 113 at 16–18. That is so, Sazerac argues, because repeat purchasers "know the attributes of [Southern Comfort Malt] (including its alcohol content)" and continue to buy it anyway. *Id.* at 16. Thus, "[t]he fact that" repeat purchasers continue to buy Southern Comfort Malt means they are "satisf[ied]" with the product and are therefore uninjured. *Id.* at 18. Sazerac supports this claim by pointing to a survey where respondents "gave the product . . . a very high satisfaction score." *Id.* This argument fails for two reasons.

First, it is premised on Sazerac's proffered evidence, which the jury might disregard. In fact, with respect to the claim that repeat purchasers "know the attributes" of Southern Comfort Malt, Sazerac's own expert, Dr. David Reibstein, states only that "[r]epeat purchasers of [Southern Comfort Malt] are *more likely to know* that the product" contains malt instead of whiskey. Dkt. 113-5 ¶ 119 (emphasis added). He does not say that repeat customers necessarily *do* know that Southern Comfort Malt is a malt product. Moreover, one of the named plaintiffs, Steven Kahn, testified at deposition that although he had previously purchased Southern Comfort Malt on four different occasions, he misidentified it as Southern Comfort Whiskey each time. *See* Dkt. 128-2 at 14, 36.

Second, the Court cannot agree that customer satisfaction belies any claim of injury. Just because a customer is satisfied with a product, doesn't mean they aren't being charged a price premium. *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 347 n.7 (S.D.N.Y. 2020) ("[M]erely because some consumers say they are satisfied with certain characteristics of the Product does not mean they were not injured."). And more to the point, it's the existence of a price premium, not satisfaction, that plaintiffs claim shows actual injury here. *Eidelman*, 2022 WL 1929250, at *1.

**CONCLUSION**

For the foregoing reasons, Sazerac's motions to exclude are DENIED; Sazerac's motion for summary judgment is DENIED; and plaintiffs' motion to exclude is DENIED as moot.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 113, 114, 115, 116, and 131.

SO ORDERED.

Dated: September 29, 2026
New York, New York

ARUN SUBRAMANIAN
United States District Judge